UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
WILLIAM BABY and JOSE BABY,

**ORDER**
14-CV-3297 (JMA) (GRB)

                 Plaintiffs,

    -against-

NASSAU HEALTHCARE CORPORATION
and MICHAEL GONZALEZ,

**FILED**
**CLERK**
8/1/2017 9:38 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

                 Defendants.
--------------------------------------------------------X

**APPEARANCES:**

    Michael G. O'Neill
    Office of Michael G. O'Neill
    30 Vesey Street, Suite 301
    New York, NY 10007
        *Attorney for Plaintiffs*

    Brian J. Clark
    Emily M. Tortora
    Venable LLP
    Rockefeller Center
    1270 Avenue of the Americas, 24th Floor
    New York, New York 10020
        *Attorneys for Defendants*

**AZRACK, United States District Judge:**

       Plaintiffs Jose Baby ("JB") and William Baby ("WB"), who were both born in India and have a common South Asian ethnicity, allege that defendants Nassau Health Care Corporation ("NHCC") and Michael Gonzalez discriminated against them based on their race/ethnicity and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. Section 2000e et seq.; the Civil Rights Act of 1866, 42 U.S.C. Section 1981 ("Section 1981"); and 42 U.S.C. Section 1983 ("Section 1983"). The Court referred defendants' motion for summary

1

judgment to the Honorable Gary R. Brown, who issued a report and recommendation (the "R&R") recommending that defendants' motion be granted on JB's claims, but denied on WB's claims. JB and the defendants filed timely objections to the R&R. For the reasons stated below, the Court concludes that defendants are entitled to summary judgment on the claims of both JB and WB.

Familiarity with the R&R, the parties' objections, and underlying motion papers is assumed.

## A. Standard for Reviewing a Magistrate Judge's Report and Recommendation

In reviewing a magistrate judge's report and recommendation, the court must "make a de novo determination of those portions of the report or . . . recommendations to which objection[s] [are] made." 28 U.S.C. § 636(b)(1)(C); see also Brown v. Ebert, No. 05-CV-5579, 2006 WL 3851152, at *2 (S.D.N.Y. Dec. 29, 2006). The court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Those portions of a report and recommendation to which there are no specific reasoned objection are reviewed for clear error. See Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008).

The Court has reviewed the portions of the R&R, to which no party objected, for clear error. Finding no such error, the Court adopts those portions of the R&R as the decision of the Court. The Court has considered the portions of the R&R to which JB and the defendants objected de novo. The Court's de novo review of these objections is discussed in more detail below.

## B. WB's Claims

The R&R recommended that defendants' motion for summary judgment be denied with respect to WB's claims. Defendants objected to this recommendation. WB did not submit a response to defendants' objection.

2

The critical question is whether, at the third step of the McDonnell Douglas analysis, WB offered sufficient evidence for a reasonable jury to infer that Gonzales's purported rationale for terminating WB was a pretext for discrimination.

**1. Standard**

For the purposes of this Order, the Court assumes that both JB and WB have established a prima facie case. Once a plaintiff has established a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its action.

"The plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 253). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

A plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 256); see also Taylor v. Family Residences and Essential Enters., Inc., No. 03-CV-6122, 2008 WL 268801, at *8 (E.D.N.Y. Jan. 30, 2008) ("[A plaintiff] may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." (citations and internal quotation marks omitted)). However, "[it] is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." Grant v. Roche Diagnostics Corp., No. 09-CV-1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011) (quoting Kalra v. HSBC Bank USA, N.A., 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008)).

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the [employer's] explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves, 530 U.S. at 147. Where a plaintiff offers evidence of pretext, courts must take a "case-by-case approach" and examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143). Whether summary judgment is appropriate depends on "a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" on a motion for summary judgment. Reeves, 530 U.S. at 148–49. As the Court in Reeves noted, even if "the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation," judgment as a matter of law may still be appropriate, where, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether

the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Id. at 148.

WB must ultimately prove that his race, ethnicity, and/or national origin was a motivating factor behind his termination. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015).

The Court concludes that WB cannot show that the reasons proffered by Gonzales for WB's termination are pretextual. Moreover, even assuming arguendo, that there is a factual dispute about pretext, no reasonable jury could conclude that this was a pretext for discrimination.

**2. WB Cannot Show Pretext**

In reciting the relevant factual background, the R&R explained that:

> Gonzalez became W. Baby's supervisor shortly after W. Baby started at NHCC. Because their shifts did not wholly overlap, Gonzalez only infrequently observed W. Baby's performance. As a result, he often relied on direct observations of Stephaney Lewis, the [Central Sterile Department ("CSD")] employee who had the most seniority on W. Baby's shift. Gonzalez testified that in their communications, Lewis alerted Gonzalez to what she believed to be W. Baby's performance deficiencies, including his failure "to prioritize the trays according to the needs of the OR." On one occasion, Gonzalez instructed Lewis to assign W. Baby to "prep and pack" trays, with the intent that he would extend his shift by two to three hours to observe W. Baby perform the task. According to Gonzalez, his observation confirmed Lewis's account. W. Baby testified that at no point did Lewis serve in a supervisory role over him or direct him to perform any particular assignment.

(R&R at 11–12 (citations omitted).) The R&R went on to conclude that WB's testimony on these issues contradicted Gonzales's account and, thus, raised a factual dispute concerning pretext. The R&R also relied on purported discrepancies between Gonzales's proffered rationale for terminating WB and a "Probation Evaluation" form that Gonzales filled out at the time of WB's termination.

5

On WB's "Probation Evaluation" form, Gonzales checked off boxes indicating that WB's "Job Knowledge" and "Volume of Work" were "Unsatisfactory." (Clark Decl. Ex. 8.) In the small comments section on this form, Gonzales hand-wrote:

> It is evident through direct observation that [WB] has deficiencies relating to some of the serious tasks (processing of clinic and ancillary departments instrumentation, case cart preparation and operating room trays) that Central Supply is responsible for. This deficiency has led to a lack of productivity from [WB], which has the potential to compromise patient care. It is for these reasons that [WB] has not passed his probation.

(Id.)

As explained below, the Court disagrees with the R&R's pretext analysis. In addressing pretext, the R&R stated:

> For example, the Probation Evaluation completed by Gonzalez states that the evaluation had been based on "direct observation" of W. Baby's performance. Yet, as W. Baby notes, "Gonzalez testified that the only source for his conclusion that [W. Baby]'s job knowledge was unsatisfactory was from the reports of . . . Lewis. There is no mention of Lewis's input in the evaluation form."

(R&R at 34 (citation omitted).)

While it is true that the Probation Evaluation does not explicitly mention Lewis's input, a reasonable jury could not infer pretext from that omission. The Probation Evaluation form provides a mere three lines for the supervisor to provide written comments. Gonzales squeezed a substantial amount of information in this limited space, and no reasonable jury could, after reviewing this document, find that Gonzales's failure to mention Lewis's name and her reports to him on this form is suggestive of pretext. Moreover, as defendants correctly point out, the Probation Evaluation form does not state that the "direct observation" at issue was performed solely by Gonzales—the term "direct observation" is broad enough to include the direct observations of both Gonzales and Lewis. Also, even assuming that "direct observation" is limited to Gonzales's own observations of WB, the Evaluation form was not, on its face, inaccurate—

6

Gonzales did directly observe WB on at least one occasion and testified that he based his decision to terminate WB on both his observation as well as Lewis's reports.

Furthermore, contrary to WB's argument, the fact that "Gonzalez testified that the only source for his conclusion that [WB's] job on knowledge was unsatisfactory was from the reports of . . . . Lewis" is not probative of pretext. The Probation Evaluation form does not state that Gonzales's conclusion that WB's job knowledge was deficient was based on Gonzales's own observations. The Probation Evaluation contains one reference to "Job Knowledge"—a field where Gonzales simply checked "Unsatisfactory." Although the brief comments on the Probation Evaluation refer to "direct observation," the criticisms in this section all appear to concern WB's deficient "Volume of Work" and productivity—those comments do not appear to address WB's deficient job knowledge. WB's argument attempts to read too much into these brief comments, none of which explicitly state (or even imply) that WB's deficient job knowledge was based on Gonzales's own direct observation.

In addressing pretext, the R&R also stressed:

> Gonzalez contends that Lewis would report to Gonzalez about W. Baby's performance, and that on one occasion Gonzalez instructed Lewis to assign W. Baby to "prep and pack" so that Gonzalez could observe him. W. Baby, on the other hand, contends that at no point did Lewis supervise him or assign him work.

(R&R at 34.)

Although WB's declaration states that Lewis never supervised his work, instructed him, or assigned him work, WB's deposition testimony on this point was much more equivocal. At his deposition, WB initially denied that Lewis instructed him "as to what work to be done or how to do" his work. (WB Dep. 29.) However, WB went to explain that:

> Nobody ever gave me in-service or how to do the work, because when I was there, everybody just like me. . . . but if a coworker need help to do a tray they will ask, "William, can you do this one? Can you do this, do that? We need a tray to give it

7

upstairs." Yes, that kind of commandment, I took it. It's not only from [Lewis]. Other people also tell me that, "Okay, we need that – Can you do that or can you do this? Can you take tray?" It was like group work, like a joint, and like a teamwork."

(Id.)

This equivocal testimony—in which WB concedes that other employees, including Lewis, would, at times, ask WB to work on certain trays or perform certain tasks—is insufficient to show that Gonzales lied when he testified that: (1) Lewis reported deficiencies in WB's work; and (2) he told Lewis to assign WB to "prep and pack" one day so that he could observe WB's performance. (See Gonzales Decl. ¶¶ 13–14.)

Two additional points further illustrate why plaintiff has not raised a factual issue concerning pretext. First, plaintiff has not even deposed Lewis.[1] Second, this is not a case where Gonzales, the alleged discriminator, claims that that he observed WB engage in certain conduct and WB simply denies Gonzales's version of events. Instead, WB attempts to use his equivocal deposition testimony to try to show—based on a chain of speculative inferences—that Lewis never reported the information that Gonzales claims to have received from her.[2] Even assuming arguendo that a jury could conclude from WB's testimony that Lewis's account of her interactions with WB were not accurate (or even fabricated by her), that alone is insufficient to establish that Gonzales's proffered rationale for terminating WB was pretextual. Even if Lewis fabricated her

---

[1] As discussed infra, plaintiff also failed to depose Theatrice Coats, a relevant witness concerning JB's claims. In their summary judgment briefing, plaintiffs argued that, during discovery, defendants failed to identify Lewis and Coats as witnesses who had knowledge of the plaintiffs' performance. Plaintiffs, however, could have still sought to depose these witnesses after deposing Gonzales. (See R&R at 11 n.10.)

[2] The R&R analogized the instant case to this Court's decision in Graham v. City of New York, No. 05-CV-5428, 2009 WL 909622, at *1 (E.D.N.Y. Mar. 10, 2009) (report and recommendation) (Azrack, M.J.), adopted as modified, 2009 WL 909620 (E.D.N.Y. Mar. 31, 2009). Graham, however, is distinguishable. In Graham, the plaintiff's supervisor insisted, inter alia, that the plaintiff failed to comply with certain instructions, but the plaintiff explicitly denied that any such instructions were given. Graham, 2009 WL 909620, at *1. The decision in Graham also noted that the result may have been different if the complaints about the plaintiff had come from "a third party," rather than from the alleged discriminator. Id. Here, Lewis, who is not alleged to have harbored any discriminatory intent, is a third party.

8

observations of WB, WB has never argued that Lewis discriminated against him and there is no evidence indicating that Gonzales, who testified that he relied on Lewis's reports, knew that she had fabricated those reports.

Finally, WB suggests, in his 56.1 statement, that Gonzales lied when he testified that Lewis acted as the "lead worker" on WB's shift. This argument is flawed and does not suggest pretext. According to Gonzales, technicians in CSD receive guidance and instruction from the "lead workers" on a shift, who have the most seniority. (Gonzales Decl. ¶ 9; Gonzales Dep. 46–47.) Gonzales testified that Lewis, who had worked at NHCC for 20 years, was the "lead worker" on WB's shift. (Gonzales Dep. 47; Gonzales Decl. ¶ 9.) In his affidavit and deposition testimony, WB asserted that Lewis was not his supervisor and, from what he "knew, she was just a regular worker." (WB Decl. ¶ 6; WB Dep. 29.) WB, however, never explicitly addressed the concept of a "lead worker" in his declaration or deposition testimony. Although WB's 56.1 statement states that the "role or position of lead worker did not exist at NHCC," the record contains no support for this assertion. (Pls.' 56.1 Statement at 11.) And, even if there was, such a factual dispute would not be sufficient to establish pretext in light of the other evidence addressed above.

### 3. WB Cannot Show Discrimination

Even assuming <u>arguendo</u> that WB could raise a factual dispute on the issue of pretext, WB would still have to offer sufficient evidence that would permit a jury to infer that Gonzales's alleged reasons for the termination were a pretext for discrimination. As explained below, no reasonable jury could infer, from the instant record, that Gonzales's decision to terminate WB was motivated by WB's race, ethnicity, or national origin.

In finding that WB offered sufficient evidence to survive summary judgment, the R&R relied on: (1) a purported factual dispute over Gonzales's response to WB's complaint that a co-

9

worker made derogatory comments about him; and (2) the declaration of Togby Thomas, another Indian employee under Gonzales, who claimed that Gonzales gave non-Indians preferential treatment.

As explained below, none of these points, even when considered collectively and in light of the other evidence cited by WB, are sufficient to raise an inference that Gonzales's proffered reasons for WB's termination were a pretext for discrimination.

*i. WB's Complaint to Gonzales about a Co-Worker's Discriminatory Comments*

According to WB, Anthony Shaw, one of WB's co-workers, called WB a "Paki," "Mohammed," and a "Muslim spy." (WB Dep. 36.) At some point, WB orally complained to Gonzales about Shaw's comments. (Id.) According to WB, Gonzales did not take any action in response to WB's complaint and told him "I can't close somebody's mouth" and "You got to deal with it. You need a little more . . . harder skin." (Id. at 37.)

Gonzales testified to a different version of these events, claiming that WB merely told him that Shaw had asked WB whether he was Muslim and had once called him "Ms. McNamara's spy." (Gonzales Decl. ¶ 15.) Gonzales insists that he then held a meeting with both Shaw and WB in which Shaw apologized to WB and shook his hand. (Id. ¶ 16.)

At his deposition, WB testified he did not recall a meeting with Gonzales and Shaw, and conceded that such a meeting "could" have happened. (WB Dep. 38, 40–41.)

For purposes of summary judgment, the Court must, of course, view the evidence in the light most favorable to WB. Generally, this would require the Court to accept WB's version of events. However, as defendants stress, WB does not squarely dispute Gonzales's account that a meeting occurred between WB, Gonzales, and Shaw. Because WB did not squarely refute the existence of this meeting, he has not raised a genuine factual dispute on this issue. In light of

10

Gonzales's testimony that this meeting did, in fact, occur, a reasonable jury could not find otherwise based on WB's testimony. Thus, contrary to the R&R's recommendation, there is not a genuine and material factual "dispute as to management's reaction to the purported discriminatory comments" that "preclude[] summary judgment." (R&R at 35–36.)

Moreover, even assuming <u>arguendo</u> that WB's deposition testimony is sufficient for a jury to conclude that Gonzales never held a meeting with WB and Shaw to address Shaw's comments, Gonzales's failure to properly address Shaw's discriminatory comments does not suggest that Gonzales harbored discriminatory intent.

Numerous courts have concluded that a supervisor's failure to respond adequately to a plaintiff's complaint about derogatory comments made by a co-worker is insufficient to show that the supervisor himself harbored discriminatory intent. <u>See</u> <u>Swenson v. Schwan's Consumer Brands N. Am., Inc.</u>, 500 Fed. App'x 343, 346 (5th Cir. 2012) ("[Plaintiff] argues that [his supervisor]'s failure to respond to the age-related comments [made by a co-worker with no influence over the discharge determination] indicates [the supervisor's] age-related bias. However, the law focuses on the speaker's authority, not that of those who decline to intervene."); <u>Berry v. Empire Homes Servs. LLC</u>, No. 06-CV-2354, 2010 WL 1037948, at *8 (E.D.N.Y. Mar. 18, 2010) ("[P]laintiff merely claims that [his superiors] never addressed [a co-worker's] comment or disciplined him and thereby tacitly approved of his behavior. . . . This alleged failure to discipline [the co-worker] does not create an inference of intentional discrimination, and plaintiff offers no authority suggesting otherwise."); <u>Cooperman v. Solil Mgmt., Inc.</u>, No. 98-CV-8099, 2000 WL 16929, at *5 & 5 n.4 (S.D.N.Y. Jan. 11, 2000) ("Plaintiff does not argue that [his superior] made any discriminatory comment, but only that she failed to defend him. We cannot fathom, and have found no authority to suggest, that an employer's failure to stand up for its

11

employee in the midst of tense negotiations [during which a union representative made an age-based comment] is itself evidence of discrimination."); cf. Blundell v. Nihon Kohden Am., No. 15-CV-1503, 2017 WL 318842, at *7 (N.D.N.Y. Jan. 23, 2017) (rejecting plaintiff's argument that an inference of age discrimination may be drawn based on defendant's failure to act in response to comments by co-workers and explaining that this argument was "a misplaced attempt to repackage the inverse of an employer's affirmative defense to hostile-work-environment claims into factual allegations sufficient to state a discriminatory discharge claim"); Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 954 (8th Cir. 2012) (holding that one superior's reaction, and another superior's lack of reaction, to a comment made by a third employee did not constitute "direct evidence of a discriminatory motive" for plaintiff's firing).

Furthermore, no reasonable jury could infer discriminatory intent from Gonzales's statements that "I can't close somebody's mouth" and "You got to deal with it. You need a little more . . . harder skin." Nothing in these statements suggests that Gonzales was endorsing or adopting Shaw's derogatory comments.

      *ii. Togby Thomas's Declaration*

Togby Thomas was another employee of Indian national origin who worked in the CSD under Gonzales. Thomas resigned from NHCC in January 2012. WB relies on a declaration from Thomas for two points. First, Thomas maintains that Gonzales gave preferential treatment to non-Indians. Second, Thomas asserts that Gonzales forced him to resign by changing his work schedule. Gonzales disputes Thomas's account of the circumstances surrounding his resignation. WB suggests that—given this factual dispute concerning Thomas's resignation—a jury could infer that WB's termination was discriminatory. Both WB and JB also argued that the fact that all three

12

Indian employees in the thirteen-person CSD were either terminated or forced out within months of Gonzales joining that department is evidence of discrimination.

In concluding that WB's claims should survive summary judgment, the R&R reasoned that "Thomas's claim of Gonzalez's preferential treatment of non-Indians also strongly supports W. Baby's claim that defendants' offered reasons for his termination were pretextual."[3] (R&R at 36.)

The Court disagrees on this point. Thomas's affidavit asserts in conclusory fashion that Gonzales would treat Indian employees "differently" than other employees and treated "some employees more favorably." (Thomas Decl. ¶ 6.) These conclusory assertions, standing alone, have no probative value on the question of pretext or discrimination. Thomas does not provide specifics about any incidents in which particular non-Indian employees received preferential treatment.

Thomas's declaration does provide some details concerning two incidents—a reprimand that Gonzales allegedly gave him and Gonzales's actions that led to Thomas's resignation. As explained below, neither of these incidents are probative of discrimination and they are certainly insufficient to show that WB's termination was discriminatory.

With respect to the alleged reprimand, Thomas maintains that on one occasion, Gonzales "reprimanded" him when Thomas left for his break on time and returned from his break on time. (Id.) Thomas asserts that there was no reason for Gonzales to reprimand him because he had followed the hospital's policies "by leaving and returning from my breaks." (Id.) Thomas, however, does not actually identify any non-Indian employees who engaged in similar conduct

---

[3] The R&R did not explicitly address Thomas's resignation in the context of WB's claim. However, in recommending that summary judgment be granted on JB's claims, the R&R concluded that the fact that all three Indian employees in the CSD were forced out was insufficient for a jury to infer that Gonzales discriminated against JB. The R&R reasoned that "a sample size of thirteen employees is too small to draw any inference of discrimination." (R&R at 31.) JB objects to the R&R's analysis of this evidence. As explained infra, this evidence is insufficient to stave off summary judgment for either plaintiff.

13

and were treated differently by Gonzales. This single incident—which, in any event, was minor and involved no adverse consequences—is insufficient to suggest that Gonzales's harbored discriminatory intent.[4]

Thomas's declaration also addresses the events that led to his resignation from CSD. Thomas and Gonzales provide conflicting accounts—a jury could find that Gonzales placed Thomas in a situation where he was forced to resign and that Gonzales's contrary explanation for Thomas's resignation was a fabrication. Even accepting Thomas's account of the incident, however, no reasonable fact finder could conclude that WB's termination was discriminatory.

In the end, WB is left to rely on: (1) his weak evidence of pretext; (2) the disputed circumstances of Thomas's resignation; and (3) the fact that all three Indian employees in the 13-person CSD were terminated or forced out by Gonzales within a few months. This evidence, however, is insufficient to show that WB's termination was discriminatory. The mere fact that all three Indian employees were terminated or forced to resign has limited probative value concerning Gonzales's discriminatory intent. Moreover, the probative value of that bare fact is further undermined because the record here reveals the specific circumstances under which JB was terminated, and, as explained below in the discussion of JB's claims, the Court agrees with the R&R that no reasonable jury could find that defendants' rationale for terminating JB was pretextual. In light of that conclusion, the mere fact that all three Indian employees were terminated or forced to resign has little, if any, probative value because no reasonable jury could

---

[4] WB's 56.1 statement asserts that Gonzales initially attempted to take "leave entitlements" away from Thomas as punishment for this incident. (Pls.' 56.1 at 39.) The record, however, does not support this assertion. WB cites to a disciplinary document that indicates that WB was reprimanded in October 2011 because two boxes he prepared for a doctor did not have laryngoscope handles in them. (Federici Decl. Ex. O.) This disciplinary document has nothing to do with a "break." Either this disciplinary document was issued for a completely different incident or, more likely, this document shows that Thomas's claim that he was reprimanded concerning a break is simply incorrect. In either event, this document, which WB himself cites, does not help his cause.

14

find that the firing of JB—one of the three Indian employees at issue—was discriminatory.[5] Thus, WB is left to rely on his weak evidence of pretext and the circumstances surrounding Thomas's forced resignation. That evidence is simply insufficient for a reasonable jury to conclude that WB's termination was discriminatory.

C. **JB's Claims**

JB objects to the R&R's recommendation that defendants are entitled to summary judgment on his claims. Before addressing the substance of JB's arguments, it must be stressed that JB's objection fails to provide any citations to the record or the parties' 56.1 statements. This deficiency alone is reason for this Court to deny JB's objection. In any event, the Court has also considered the substance of JB's objections and rejects his arguments on the merits, largely for the reasons stated in the R&R. The Court will briefly address some of JB's arguments that warrant additional discussion.

> In addressing JB's claim of pretext, the R&R explained that
>
> > the manufacturer guidelines [for the STERRAD machine] explicitly state that flexible endoscopes may be used on the flex cycle, and J. Baby admitted that he had run flexible larngoscopes on the flex cycle in the past. And this motion is not a proper forum in which to debate the necessity of using the STERRAD machine during the sterilization process. J. Baby's own exhibits make clear that the STERRAD machine had been used in the sterilization process since at least 2009, two years before Gonzalez was hired, thereby undermining any claim that use of the STERRAD was the product of Gonzalez's purported discriminatory animus. Thus, even assuming CSD's use of the STERRAD machine was medically superfluous as J. Baby contends, an unlawful animus cannot reasonably be inferred.

(R&R at 24 (citations omitted).)

> In his objection, JB asserts that the R&R misunderstood his argument, contending that
>
> > Jose was terminated because Gonzalez falsely advised Hospital's management that running the scope through the regular cycle ran the risk that the scope was

---

[5] The probative value of the fact all three Indian employees were terminated or forced out is further undercut by evidence showing that, between 2012 and 2015, Gonzales also played a role in the termination of six non-Indian employees from CSD.

15

improperly sterilized, putting a patient's health in jeopardy. Jose's argument is that Gonzalez knew that the scope was completely sterile, but lied to management in order to cause Jose to be terminated.

(JB Obj. at 3–4.)

This objection is meritless. A reasonable jury could not find, based on the instant record, that Gonzales knew—contrary to his statements to management—that the scope was, in fact, properly sterilized and posed no risk to patient safety after it had been run in the STERRAD machine on the standard, rather than the flex, cycle. As an initial matter, the fact that Keisha Lou-McKenzie, the other employee involved in this incident, was also disciplined shows that Gonzales in fact believed that the scope was improperly sterilized and posed a safety risk.[6] (See Gonzales Dep. 198; Federici Decl. Ex. M at NHCC PBD 000168 (email in which Gonzales states that both JB and Lou-McKenzie "failed to pick up on" the sterilization error).)

Moreover, all of the evidence in the record shows that Gonzales had ample reason to believe that the flexible laryngoscope was not properly sterilized. The manufacturer's guidelines for the STERRAD machine and the hospital's own internal documents only discuss the sterilization of flexible endoscopes on the flex cycle. (See R&R at 9 & 9 n.9; Federici Decl. Exs. H, I, R.) Accordingly, Gonzales had ample reason to believe that running a flexible scope on the standard cycle would not have resulted in proper sterilization—no document in the record affirmatively states that flexible laryngoscopes (or other flexible endoscopes) can be run on the standard cycle.

JB also argues that he can show pretext because, according to JB, running the flexible laryngoscope through the STERRAD machine was completely superfluous and the scope would have been safe for patient use even if it had never been run through the STERRAD sterilization

---

[6] JB argues that the lesser discipline meeted out to Lou-McKenzie is evidence of discrimination. The Court, however, agrees with the R&R that Lou-McKenzie was not similarly situated to plaintiff.

16

machine. Specifically, JB contends that: (1) such scopes are classified as semi-critical items, which only require high-level disinfection (rather than sterilization); and (2) at NHCC, such scopes are soaked in a high-level disinfectant prior to being run through the STERRAD machine. Thus, JB contends that Gonzales lied when he asserted that the laryngoscope at issue posed a risk to patient safety. Given the hospital's long-standing practice to both sterilize and disinfect these scopes, Gonzales's failure to conclude (and explain to his superiors) that sterilization in the STERRAD machine was completely unnecessary does not suggest pretext.[7]

In light of all of the above, a reasonable jury could not conclude that Gonzales knew that the scope was properly sterilized and posed no safety risk. As the R&R concluded, even assuming arguendo that a jury could conclude that Gonzales was incorrect in his assessment, that would be insufficient, based on the instant record, to establish pretext. R&R at 24; Grant, 2011 WL 3040913, at *11 ("[It] is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination").

---

[7] In support of this argument, JB relies on his own declaration, which states that a laryngoscope is a "semi-critical device" and that "applicable standards do not require sterilization but just that the instrument is highly disinfected." (JB Decl. ¶ 14.) JB's opposition brief also cites to a document from the Centers for Disease Control and Prevention ("CDC") that appears to classify flexible laryngoscopes as semi-critical items that only require high-level disinfection. (Pls.' Opp. Br. at 17.) This 161-page CDC document (for which JB fails to provide any pin citations) recommends that:

- hospitals "[p]rovide, at a minimum, high-level disinfection for semicritical patient-care equipment (e.g., gastrointestinal endoscopes, endotracheal tubes, anesthesia breathing circuits, and respiratory therapy equipment) that touches either mucous membranes or nonintact skin"; and

- "endoscopes and accessories that contact mucous membranes [be processed] as semicritical items, and use at least high-level disinfection after use on each patient."

(See Guideline for Disinfection and Sterilization in Healthcare Facilities, 2008, at 84, 87 (emphasis added), available at https://www.cdc.gov/infectioncontrol/pdf/guidelines/disinfection-guidelines.pdf.) In light of the hospital's long-standing practice to sterilize flexible laryngoscopes, neither this CDC guidance nor JB's declaration is sufficient to suggest pretext.

JB also objects to the R&R's analysis of the first two disciplines Gonzales issued to JB. These objections are also unpersuasive. The Court agrees with the R&R's analysis of these issues and briefly adds the following points.

As to the first discipline, contrary to JB's argument, the "3 Hour Steam B.I. Record" ("Record") underlying this discipline, (Clark Decl. Ex. 10), does not show that other employees made the "same mistakes" as JB, (JB Obj. at 6). JB was the only employee whose written entry on the Record was clearly inaccurate. While other employees may have failed to check the "biological" vial as promptly as they should have, such an error is simply not the same as JB's patently incorrect entry on the Record.[8]

JB also argues that the second discipline he received is suspect. JB received a written reprimand for leaving several trays uncompleted at the end of his shift. (Clark Decl. Ex. 12.) According to JB's testimony, when Gonzales gave JB this reprimand, Gonzales told him:

> this has nothing to do with me because he is just handing over the document . . . . Just sign it, this had nothing to do -- I know you are okay, you are fine, but the other person, Theatrice [Coats], gave me this so I am just giving to you. It has nothing bearing on you, just sign it.

(JB Dep. 31.)

Critically, JB does not dispute that he failed to process the trays referenced in the written reprimand that he received. JB, however, asserts that the explanation of this discipline that

---

[8] JB received verbal counseling for entering incorrect information on the Record. The "Verbal Counseling" memo for the incident that Gonzales drafted also states that "the biological [vial] needs to be read promptly in 3 hours once it has been incubated." (Clark Decl. Ex. 11.) Entries on the Record appear to show that JB and other employees failed to promptly read the "biological" (also referred to as the "Results Vial") in three hours. For example, on September 16, an employee identified as "Red" checked a vial approximately seven hours after another employee had initially placed the vial in the incubator. Similarly, on September 18, 2011, JB checked two vials five hours after they were placed into the incubator. (Id.) Gonzales, however, did not discipline JB for these actions, which are not even mentioned in the September 24, 2011 "Verbal Counseling" memo. Rather, all of the evidence indicates that Gonzales gave JB verbal counseling because of the inaccurate information that he entered on the Record. This is a further reason why any failure by Gonzales to discipline other employees for not promptly checking the biological would not suggest discrimination.

18

Gonzales provided to JB—namely, that Theatrice Coats, the supervisor who was on duty at the time, was responsible for this discipline—is so patently absurd that it suggests pretext. This argument is meritless. Notably, JB did not even depose Coates. Moreover, nothing in the record supports JB's speculative argument that Coates could not have possibly initiated this discipline. In his objection, JB contends that "Coats was an offsite contract worker, and she would have had no role in the discipline of employees." (JB Obj. at 6.) However, nothing in the record supports JB's assertion that Coats had "no role" in employee discipline. Notably, JB testified that Coats was a "management consultant who was hired from an agency to fix the department." (JB Dep. 31.) It is not surprising that a person in such a position would play a role in employee discipline, and JB points to no contrary evidence concerning the scope of Coats's responsibilities at NHCC. JB also argues that it made "no sense" to discipline JB "for following directions." (JB Obj. at 7.) JB, however, was not disciplined for following directions. According to JB, Coats told him to "prioritize" "a spinal fusion tray." (JB Decl. ¶ 12.) And, later that shift, he also had to prioritize a "labor and delivery cart." (Id.) There is, however, no evidence that Coats ever told JB that he did not have to also finish his regular work that shift.[9] At best, JB's evidence suggests that the discipline he received was harsh, and maybe even unfair. However, that alone is not enough to suggest that Gonzales's account of this incident was a pretext for discrimination, particularly when JB did not even depose Coats.

JB's remaining argument is that the R&R erred in concluding that the fact that Gonzales terminated or forced the resignation of all of three Indian employees in the Central Sterile Department was insufficient to prove discrimination.

---

[9] Coats does not appear to have given JB any instructions regarding the "labor and delivery cart." And, even if she had told him to prioritize this cart, there is no evidence that Coats ever told JB that he did not have to also finish his regular work that shift

19

The Court agrees with the R&R's conclusion that such evidence is insufficient to establish that defendants' rationale for terminating JB was a pretext for discrimination. The Court previously addressed this evidence in the context of WB's claim. Again, the mere fact that all three Indian employees were terminated or forced to resign has limited probative value concerning Gonzales's discriminatory intent. In light of the other evidence in the record, this bare fact is not sufficiently probative for a reasonable jury to infer that JB's termination was discriminatory.

### D. Conclusion

After considering the parties' objections and the R&R, the Court grants defendants' motion for summary judgment on the claims of both JB and WB for the reasons above. The Clerk of Court is respectfully directed to enter judgment accordingly and to close this case.

Dated: August 1, 2017
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE